IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

SHANE HOLBROOK,

       Plaintiff,

v.                                   Case No. 3:21-cv-00170

CARL ALDRIDGE
WRJ Administrator, et al.,

       Defendants.

**PROPOSED FINDINGS AND RECOMMENDATIONS**

Plaintiff Shane Holbrook, proceeding *pro se*, seeks relief under 42 U.S.C. § 1983 for alleged violations of his civil rights. This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and by standing order has been referred to the undersigned United States Magistrate Judge for total pretrial management and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3).

Pending before the Court are Holbrook's amended complaints, (ECF Nos. 7, 10); the defendants' motions for summary judgment, (ECF Nos. 94, 97); and Holbrook's motion to voluntarily dismiss this action, (ECF No. 101). After thoroughly considering the arguments and supporting materials, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** the defendants' motions for summary judgment, (ECF Nos. 94, 97); **DENY** Holbrook's motion to voluntarily dismiss, (ECF No. 101); **DISMISS** Holbrook's amended complaints, with prejudice, (ECF Nos. 7, 10); and

**REMOVE** this case from the docket of the Court.

## I.    <u>Relevant Factual and Procedural History</u>

Holbrook initiated the instant action on March 15, 2021. (ECF Nos. 1, 2). The claims arise from Holbrook's arrest on January 6, 2021 by law enforcement officers with the Huntington Police Department, including Defendants Heighton and Miller ("HPD Defendants"), and Holbrook's subsequent incarceration in the Western Regional Jail and Correctional Facility ("WRJ") by Defendants Aldridge, Wallace, Keaton, Preece, Endicott, Romans, Albright, and Diamond ("DCR Defendants").

By all accounts, early in the morning of January 6, 2021, Holbrook called 911 from his home on Piedmont Drive in Huntington after seeing four strangers at his back door and smelling smoke under the floorboards of his house. Police officers and firefighters were dispatched to Holbrook's residence. The HPD Defendants arrived at the scene minutes later, but Holbrook refused to allow them entry into his residence, stating that he did not believe they were "real police." Officers subsequently broke through the door of the house and used force to subdue Holbrook. In the course of his scuffle with officers, Holbrook was tased and then arrested. He was incarcerated in the WRJ and charged with arson, battery of a police officer, and obstructing an officer. Holbrook ultimately pled guilty to a misdemeanor charge of assaulting a police officer.

### A.    *Amended Complaints*

On April 19, 2021, Holbrook filed an amended complaint pursuant to court order. (ECF No. 7). Ten days later, on April 29, 2021, he filed a second amended complaint.[1] (ECF No. 10). In the complaints, Holbrook alleges that: (1) he was the victim of excessive

---

[1] Holbrook filed the second amended complaint as a petition for a writ of habeas corpus using civil action number No. 3:21-cv-00220. Holbrook's petition was construed as a second amended complaint in this matter and the cases were consolidated.

force by the HPD Defendants when he was arrested on January 6, 2021, and the HPD Defendants filed "trumped-up" charges against him; (2) he suffered cruel and unusual punishment when Defendants Endicott, Preece, and Wallace, who were present at his arrest on January 6, 2021, attacked him at the residence; (3) unnamed employees at the WRJ tampered with his mail and committed mail fraud; (4) religious meals served to him at the WRJ were tainted in violation of his religious rights; (5) Defendant Diamond allowed two cousins to have sexual intercourse at the WRJ within Holbrook's line of sight; (6) Defendant Wallace altered a video surveillance tape after Holbrook complained of the sexual misconduct, and then coerced Holbrook to plead guilty to a criminal charge; (7) Defendant Diamond used excessive force by shoving Holbrook when he was in full restraints; (8) Defendant Albright, who was also present at Holbrook's January 6, 2021 arrest, operated a taser attached to Holbrook's rectum,[2] exposed him to sexual misconduct, denied him basic human rights, and extorted him to plead guilty to a criminal charge; (9) Defendant Albright gave Holbrook empty breakfast trays and placed a bounty on him; and (10) he was denied access to the law library and legal resources. (ECF Nos. 7, 10).

More specifically, Holbrook claims that his mother "was held down by [Defendants Preece and Endicott and] forced to watch her son be brutally beaten and tazed" at the time of his arrest. (ECF No. 10 at 3). He states that Defendant Miller "filed trumped up charges" alleging that Holbrook attempted to burn down his own home and attacked a government employee. (*Id.*). He alleges that Defendant Wallace "coerced a 35 min.

---

[2] The undersigned notes that in the amended complaint, Holbrook alleged that Defendant Albright tased him in the rectum. (ECF No. 7 at 3). However, Holbrook later identified Defendant Heighton as the officer who tased him and, at his deposition, Holbrook conceded that no correctional officer tased or assaulted him at his house on January 6, 2021. (ECF No. 94-1 at 6, 10).

recording" after Holbrook complained about witnessing the cousins having sex. (ECF No. 10 at 3). He indicates that Defendant Albright "placed a bounty against [Holbrook's] well being with local gang members" to force Holbrook to remain silent about the alleged sexual misconduct. (*Id.*). Holbrook contends that he was denied access to the law library as he was only allowed to visit while in full restraints and was not able to gain access to the computer. (*Id.*). Finally, he asserts that he was unable to safely practice his religion. He claims that he was placed on a religious diet and made complaints about his food having "unknown substances" in it on three occasions. (*Id.*). Thereafter, he contracted COVID-19 while in segregated custody and also found "4 dark curly hairs in strange smelling dinner tray." (*Id.*).

### B.    *Defendants' Motions for Summary Judgment*

#### 1.    *DCR Defendants' motion and memorandum of law*

On April 14, 2022, the DCR Defendants filed a motion for summary judgment and accompanying memorandum of law. (ECF Nos. 94, 95). They argue that Holbrook cannot maintain this action against them for constitutional violations because they were agents of the State at the time of alleged violations and thus none are a suable "person" subject to liability under § 1983. (ECF No. 95 at 4). Next, they posit that Holbrook has no evidence of constitutional violations. (*Id.* at 4–5). They claim that he admitted during his deposition that allegations of a brutal attack by Defendants Endicott, Preece, and Wallace were false, and the attack did not occur. (*Id.* at 5). The DCR Defendants also note that Holbrook admitted the allegations that his mother was held down by Defendants Endicott and Preece were untrue, and that none of the DCR Defendants inflicted injury on him at his home on January 6, 2021. (*Id.*). Save for a *de minimis* injury from being shoved by Defendant Diamond, the DCR Defendants contend that Holbrook disclaimed in his

deposition all allegations of physical injury inflicted by the DCR Defendants. (ECF No. 95 at 5).

As to Holbrook's allegations that the DCR Defendants tampered with his food and mail, the DCR Defendants point out that Holbrook has no evidence that **they** were responsible. (*Id.*). The DCR Defendants insist that Holbrook's claims that he was not allowed to practice his religion or access the law library at the WRJ are moot because he has since been relocated to a different facility and has no evidence to show that any such actions injured him. (*Id.* at 5–6). According to the DCR Defendants, Holbrook admitted that he was not injured by Defendant Albright's alleged placing of a bounty on him, or by Holbrook's claimed observation of a sex act while at the WRJ. (ECF No. 95 at 6). With regard to Holbrook's allegation that his plea to a misdemeanor was coerced, the DCR Defendants assert that Holbrook was represented by counsel when he made the plea, and he lacks a foundation for the claim. (*Id.*).

The DCR Defendants argue that Holbrook makes no allegations of direct action by Defendant Aldridge, and he is not subject to supervisory liability under § 1983. (*Id.* at 6–7). Finally, the DCR Defendants assert that this action should be dismissed because Holbrook failed to exhaust his administrative remedies. (*Id.* at 7–10).

### 2. *HPD Defendants' motion and memorandum of law*

On April 15, 2022, the HPD Defendants filed a motion for summary judgment and memorandum of law. (ECF Nos. 97, 98). They argue that there is no evidence showing that Defendant Miller used force on Holbrook, and Holbrook conceded this in his deposition. (ECF No. 98 at 9–10). The HPD Defendants also assert that the force Defendant Heighton used to restrain and arrest Holbrook at his home was reasonable given that he had called emergency services to report that his house was on fire and he

was in danger, then barricaded himself in the residence and prevented responders from investigating the fire or ensuring the safety of others at the home. (ECF No. 98 at 12). They claim that Holbrook was acting erratically, refused to obey commands, initiated a physical altercation with Defendant Heighton, and attempted to take Defendant Heighton's taser. After regaining control of the taser, Defendant Heighton discharged the taser into Holbrook's lower back in order to subdue him. (*Id.* at 14–15). They argue that this use of force was reasonable given that "there is no question that [Holbrook] actively resisted arrest." (*Id.* at 15–16).

Next, the HPD Defendants posit that there is no evidence that they arrested Holbrook without probable cause and thus he cannot assert a claim that he was falsely arrested or imprisoned. (*Id.* at 16–18). Finally, they contend that they did not extort Holbrook to accept a plea to a charge that arose from the events at Holbrook's home. (*Id.* at 17–18). They note that Holbrook was provided with counsel and relied on counsel's advice to accept the plea deal. They point out that the decision to offer a plea deal rests with the prosecutor, and the power to accept the plea is vested with the court. (*Id.* at 18). They emphasize that Holbrook "has not made any allegation or provided even a scintilla of evidence that [the HPD Defendants] conspired" with the prosecutor, defense, or court to force Holbrook to enter a plea agreement. (*Id.*).

### 3.  *Holbrook's response*

On May 9, 2022, Holbrook filed a document arguing in opposition to the defendants' motions. (ECF No. 100). He argues that "there is a genuine dispute to material facts" and that he "does suffer damages" from the incidents he described. (*Id.* at 1). He claims that the affidavits of eyewitnesses refute the defendants' arguments and that the legal documents and video evidence he was using to support his case were not

provided to him upon his transfer to a different prison facility. (ECF No. 100 at 2).

Holbrook contends that the DCR Defendants "did knowingly with malicious intent acting under official capacity" violate his rights "by using threats, force and [coercion] to extort him into pleas under [duress] leaving him with scrapes, bruises, and mental health issues." (*Id.*). He provides that Defendant Diamond used force to "threaten, [coerce], manipulate and intimidate" him after he filed grievances and requested medical treatment and repeats his claim that someone tampered with his food which left him "malnourished and in duress." (*Id.* at 3). He claims that he wanted to "break the contract of the plea" once he was transferred away from the WRJ, but "due to the time of the sentence in the plea, breaking the contract after the sentence was already served was moot." (*Id.*).

Holbrook asserts that the defendants humiliated and taunted him and subjected him to psychological torture by "placing him in a segregation cell with the only window having a view of 2 cousins having sex." (*Id.*). He claims he was subject to retaliation because he complained about the issue by calling the Prison Rape Elimination Act hotline, and "the officers were still allowed indirect contact" with him. (*Id.*). He states that he was given food tainted "with hidden or unseen, potentially deadly, viruses and bodily substances in him." (*Id.*). He claims that after his attempts to alert staff about his concerns, he was placed in segregation and on suicide watch, and he repeats his claim that a bounty was placed on him, and his grievances went unanswered. (ECF No. 100 at 4).

According to Holbrook, Defendant Miller disobeyed the law "by allowing officers to misuse their authority," and Defendant Heighton's use of force was unreasonable because "multiple witnesses [saw] the taser deployed in the rectal area." (*Id.*). Further, he posits that Defendant Heighton's use of force was unreasonable because Defendant

Heighton broke into Holbrook's home even though other officers said there was no fire and Holbrook "said he was coming to the alley door of his home, where there is proper lighting." (ECF No. 100 at 4–5). He denies grabbing Defendant Heighton or his taser and claims that Defendant Heighton pulled Holbrook's pants down and "began tasing him repeatedly in the rectal area" as seen by eyewitnesses. (*Id.* at 5–6).

Holbrook claims that the HPD Defendants acted unreasonably by arresting him because Holbrook was the one who sought emergency services. (*Id.* at 6). He claims that the officers "fabricate[d] a story that they found a small cooler bag on a hot stove" as evidenced by body camera footage showing no smoke or fire when officers were clearing Holbrook's house. (*Id.* at 6–7). He reiterates that his plea of no contest to battery charges was made under duress after he was "starved and neglected [hygiene] and contact with his family," and claims that he attempted to exhaust his state remedies. (*Id.* at 7).

### 4. *HPD Defendants' reply*

On May 20, 2022, the HPD Defendants filed a reply in support of their motion for summary judgment. (ECF No. 104). They argue that Holbrook's response does not identify a genuine issue of material fact regarding Defendant Miller's lack of force, and Holbrook cannot recover from Defendant Miller on a theory of bystander liability. (*Id.* at 2–4). They posit that Holbrook has not provided any evidence that Defendant Heighton's use of force was unreasonable, and while Holbrook contends that Defendant Heighton discharged the taser in his rectum, such a "self-serving allegation" is not supported by evidence except unsworn declarations by his mother and sister. (ECF No. 104 at 4–5). These declarations are contradicted by (1) his mother and sister's sworn testimony at their depositions admitting that they could not see Holbrook as he was tased, (2) the records of Holbrook's medical exam at the WRJ, which does not note any injury to Holbrook's

rectum, and (3) Holbrook's testimony that, following his medical exam, he was provided with an ice pack for his knee and ibuprofen for his ribs. (ECF No. 104 at 5–6).

The HPD Defendants argue that while Holbrook claims the body cam footage does not show smoke and Defendant Heighton was told there was no fire at Holbrook's home, Holbrook himself was the one to call emergency services and report smoke. Moreover, he recalled smelling smoke at several points in his deposition testimony. (*Id.* at 6). In their deposition testimony, Holbrook's mother and sister confirmed that they saw smoke in and around Holbrook's house at the time. (*Id.*). Thus, the HPD Defendants adduce, it was reasonable for officers to use force to restrain Holbrook, who was uncooperative. (*Id.* at 6–7).

With respect to Holbrook's claim that he was moving to the alley door of the home, the HPD Defendants maintain that, regardless, Defendant Heighton was reasonable to determine that Holbrook posed a risk to himself and others because of the presence of children's toys at the residence, suggesting children might be in the residence; the potential that others were in the home and in danger; smoke coming from the residence; and Holbrook's erratic attempt to barricade the door. (ECF No. 104 at 7). They argue that, unlike other cases involving excessive force, Holbrook was actively resisting arrest based in part on his unfounded and unhinged belief that the responding officers were not "real police." (*Id.* at 7–8). The HPD Defendants claim that, even if Holbrook's statement that he "complied with police once he determined they were authentic" was true, he does not indicate he communicated his compliance to Officer Heighton, who acted only on the information that a combative individual was refusing his lawful commands. (*Id.* at 8). The HPD Defendants conclude that Holbrook's response does not refute the facts presented to officers when they responded to Holbrook's call. They emphasize, moreover, that

review using hindsight is inappropriate in assessing Holbrook's constitutional claims. (ECF No. 104 at 9).

### C.    *Holbrook's Motion for Voluntary Dismissal*

On May 10, 2022, one day after filing his opposition to the defendants' motions for summary judgment, Holbrook filed a motion to voluntarily dismiss his case without prejudice. (ECF No. 101). He explains that he "is proceeding pro se, facing respected members of the bar," and that his complaint "was filed with conclusory allegations [] as to civil rights violations." (*Id.* at 1). Holbrook adds that "the conspiracy counts need to be stated with proper factual allegations" and include descriptions of "what was seen in the body cam footage" of his alleged assault. (*Id.*).

On May 18, 2022, the defendants collectively responded to Holbrook's motion. (ECF No. 103). They oppose dismissal without prejudice because, they argue, Holbrook's motion for voluntarily dismissal is an attempt to circumvent an adverse ruling on the defendants' motions for summary judgment. (*Id.* at 1–2). The defendants contend that they "have expended significant effort and expense litigating this action," while Holbrook "has failed to conduct meaningful discovery and has further failed to set forth a shred of evidence supporting his claims." (*Id.* at 2). They assert that they deposed Holbrook in person at the Martinsburg Correctional Facility, deposed his mother and sister, served extensive written discovery, and filed motions for summary judgment. (*Id.* at 4). They note that Holbrook did not attend his witnesses' depositions or schedule any depositions of his own and instead "continually comes before this Court with conclusory allegations that are unsupported by the facts, evidence, or record of this case." (*Id.* at 5). The defendants maintain that Holbrook's five-sentence motion does not provide a substantive explanation as to why voluntary dismissal without prejudice is warranted. (*Id.* at 5–6).

They reason that Holbrook's choice to file the motion after the defendants filed their motions for summary judgment indicates that Holbrook "[senses] the weakness of his case" and the motion is an attempt to "evade dismissal of his claims." (ECF No. 103 at 6). The defendants ask the Court to dismiss Holbrook's claims with prejudice. (*Id.* at 7–8).

II.    **Standard of Review**

A.    ***Summary Judgment***

The defendants filed motions for summary judgment. Summary judgment is proper under Fed. R. Civ. P. 56 when no genuine issue of material fact is in dispute, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a disputed issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. The party moving for summary judgment bears the initial burden of showing an absence of evidence that demonstrates the existence of a genuine issue of fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

If the moving party meets this burden, then the burden shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322, n.3. The nonmoving party must do more than rely upon the allegations or the denial of allegations contained in his pleading to defeat a motion for summary judgment; instead, he must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Concrete evidence includes "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

materials." Fed. R. Civ. P. 56(c)(1)(A). The court must not resolve disputed facts, nor weigh the evidence. *Russell v. Microdyne Corp.,* 65 F.3d 1229, 1239 (4th Cir. 1995). Instead, the court must accept as true the facts asserted by the nonmoving party and review the evidence "draw[ing] all justifiable inferences" in its favor. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991).

Even still, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano,* 557 U.S. 557, 586 (2009), (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). Thus, while any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co*, 475 U.S. at 587, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (citation omitted).

The Court must liberally construe any document which is filed *pro se. Duncan v. Farmer*, No. 3:18-CV-01355, 2020 WL 3248807, at *3 (S.D.W. Va. June 16, 2020) (citations and marking omitted). Yet, "the special judicial solicitude with which a district court should view such *pro se* filings does not transform the court into an advocate, and the Court will not construct Plaintiff's legal arguments for him." *Id.*

### B.    *Voluntary Dismissal*

After the defendants filed their motions for summary judgment, Holbrook filed a motion seeking voluntary dismissal of this action without prejudice. Rule 41(a)(2) of the Federal Rules of Civil Procedure allows the court to dismiss an action at the plaintiff's

request following an opposing party's motion for summary judgment only under terms the Court deems proper. "The purpose of Rule 41(a)(2) is freely to allow voluntary dismissals unless the parties will be unfairly prejudiced." *Davis v. USX Corp*., 819 F.2d 1270, 1273 (4th Cir. 1987). "A district court should grant a Rule 41(a)(2) motion absent plain legal prejudice to the defendant." *Bridge Oil, Ltd. V. Green Pacific A/S*, 321 Fed. Appx. 244, 245 (4th Cir. 2008). The prospect of a second lawsuit, without more, does not constitute prejudice sufficient to deny a motion under Rule 41(a)(2). *Vosburgh v. Indemnity Ins. Co. of North America*, 217 F.R.D. 384, 386 (S.D.W. Va. Sep. 12, 2003). When presented with a request for dismissal under Rule 41(a)(2), the Court should consider a number of factors, including those that are "particular to a specific case" as well as: "(1) the opposing party's effort and expense in preparing for trial; (2) excessive delay or lack of diligence on the part of the movant; (3) insufficient explanation of the need for a dismissal; and (4) the present stage of the litigation, i.e.[,] whether a motion for summary judgment is pending." *Id*. (citing *Teck Gen. P'ship v. Crown Cent. Petroleum Corp*., 28 F. Supp. 2d 989, 991 (E.D. Va. 1998)).

### III.  **Discussion**

The defendants filed their motions for summary judgment before Holbrook filed his motion for voluntary dismissal. However, because granting Holbrook's motion would render the defendants' motions moot, it is necessary to resolve Holbrook's motion first. As explained in further detail below, the undersigned **FINDS** that the Court should deny Holbrook's motion for voluntary dismissal of his complaint. Furthermore, the undersigned **FINDS** that the defendants' motions for summary judgment should be granted.

13

### A.    Voluntary Dismissal

As stated above, in resolving a motion for voluntary dismissal, the Court should consider four factors: "(1) the opposing party's effort and expense in preparing for trial; (2) excessive delay or lack of diligence on the part of the movant; (3) insufficient explanation of the need for a dismissal; and (4) the present stage of the litigation, i.e., whether a motion for summary judgment is pending." *Gross v. Spies*, 133 F.3d 914, 1998 WL 8006, at *5 (4th Cir. 1998) (unpublished table decision). The undersigned will address each factor in turn.

### 1. Defendants' effort and expense in preparing for trial

The defendants advise that they conducted depositions of Holbrook, his mother, and his sister, served significant written discovery, and prepared and filed motions for summary judgment. (ECF No. 103 at 4). To obtain Holbrook's deposition, defense counsel had to travel a significant distance, to Martinsburg, as Holbrook had been transferred to a correctional facility there. This level of involvement in preparing a defense against Holbrook's claims lends support to the defendants' position that granting Holbrook's motion would unfairly prejudice them. *Compare Andes v. Versant Corp.*, 788 F.2d 1033, 1036-37 (4th Cir. 1986) (holding that district court did not abuse its discretion by denying plaintiff's Rule 41(a)(2) motion when defendants had incurred significant expenses in discovery and in filing motion for summary judgment), *with Vosburgh v. Indem. Ins. Co. of N. Am.*, 217 F.R.D. 384, 387 (S.D.W. Va. 2003) (granting motion under Rule 41(a)(2) when the defendants involvement in the case was limited to filing Rule 12 motions to dismiss and their effort was found to be "quite minimal"), *and Wellin v. Wellin*, No. 2:13-cv-1831-DCN, 2014 WL 234216, *11 (D.S.C. Jan. 22, 2014) (finding dismissal without prejudice appropriate where parties had conducted no discovery and

the only pending dispositive motion was one for judgment on the pleadings). The undersigned **FINDS** that the defendants have exerted considerable effort and incurred some expense in the course of this litigation.

### 2. *Holbrook's excessive delay or lack of diligence*

In contrast to their description of their own effort in mounting a defense, the defendants decry Holbrook's lack of diligence in pursuing this matter. (ECF No. 103 at 5). They contend that he has never "attempted to develop any factual support for his claims," did not attend the depositions of other witnesses, and did not attempt to depose any of the defendants. (*Id.*). They emphasize that Holbrook should not be allowed to "sidestep his duty to prosecute his case by asking this Court to dismiss his claims without prejudice." (*Id.*).

The undersigned notes that, while not impossible, arranging for the deposition of witnesses as an incarcerated *pro se* litigant is complicated, expensive, and burdensome. Without more, Holbrook's failure to conduct depositions does not evince a lack of diligence. As to his failure to participate in the depositions of the other fact witnesses— his mother and sister—he did not reply to the defendants' response and thus provides no explanation for this valid critique of his failure to develop a record in this case.

Throughout the pendency of this litigation, Holbrook has complied with the deadlines imposed by the Court and filed appropriate motions and responses. However, it is clear that he has not used every possible avenue available to him to develop evidence and arguments to support his claims. These failures are significant, because Holbrook is not a novice to litigation. Indeed, this is the fifth civil action he has filed in this Court alone. Considering the procedural history of this case, the undersigned **FINDS** that Holbrook has demonstrated some diligence in this matter, but not to such a degree that

granting his motion to voluntarily dismiss is warranted.

### 3. Sufficiency of Holbrook's explanation

The defendants posit that Holbrook's stated explanation of the need for dismissal is insufficient. (ECF No. 103 at 5–6). In his motion, Holbrook provides simply that he is proceeding pro se while the defendants are represented by counsel and that his complaint states only conclusory allegations. (ECF No. 101 at 1).

The defendants are correct that Holbrook's motion does not provide an adequate reason for dismissal. He initiated this action as a *pro se* litigant in March 2021 and his two separate requests for the appointment of counsel were denied, most recently in September 2021. (ECF Nos. 33, 73). He did not seek to voluntarily dismiss this action until more than eight months after his request for counsel was denied, after he and the defendants had already engaged in discovery, and the defendants had filed motions for summary judgment. Holbrook fully understood his option to voluntarily dismiss the case early in the litigation, as he was previously advised of that procedure by the undersigned in two cases and was told about the "three strikes" rule in at least one case. *See, e.g., Holbrook v. Cabell County Prosecutors Office,* Case No. 3:16-cv-03489 (S.D.W. Va. Apr. 20, 2016); *and Holbrook v. HD Media Company, LLC,* Case No. 3:16-cv-03280 (S.D.W. Va. Apr. 7, 2016). While Holbrook may feel unprepared to support his claims because of his lack of legal training and experience, such trepidation did not appear to affect his willingness to continue litigation until this case had been ongoing for more than a year and had progressed through several rounds of motions and substantial discovery. This is true despite Holbrook learning through a review of video evidence—which he completed last year—that a portion of his claims against the DCR Defendants were wholly unfounded. (ECF No. 94-1 at 99). He was previously advised that he could seek

16

appointment of counsel again if he experienced a significant change in circumstances, such as his case being set for trial. (ECF No. 73). Although the undersigned is unwilling to speculate on Holbrook's true motive for seeking dismissal, the undersigned **FINDS** that Holbrook's status as a *pro se* litigant is not reason enough to allow for voluntary dismissal of this action without prejudice at this stage in the proceedings.

### *4.  Present stage of litigation*

The defendants argue that this action should not be dismissed without prejudice because they have filed motions for summary judgment. (ECF No. 103 at 6). Indeed, the defendants have filed motions for summary judgment, to which Holbrook filed a response, and the matter is ready for disposition. *See True v. Seppala*, No. 2:13-CV-2228 DCN, 2015 WL 4937298, at *4 (D.S.C. Aug. 17, 2015) (denying motion to voluntarily dismiss when defendants had already filed a well-founded motion for summary judgment); *Francis v. Ingles*, 1 Fed. Appx. 152, 154 (4th Cir. 2001) (voluntary dismissal inappropriate filed one week before trial and after a "lengthy discovery period"). The undersigned **FINDS** that this factor weighs against granting Holbrook's motion to voluntarily dismiss.

Given consideration of all the factors, the undersigned **FINDS** that Holbrook's motion to voluntarily dismiss this action without prejudice should be denied.

### B.    *DCR Defendants' Motion for Summary Judgment*

Holbrook was apparently a pretrial detainee housed at the Western Regional Jail when the events giving rise to the second amended complaint occurred. Under the Fourteenth Amendment, a pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subjected to any form of punishment. *Riddick v. Willett*, No. 3:15CV361, 2016 WL 3282213, at *4 (E.D. Va. June 10, 2016) (citing *Martin v. Gentile*,

849 F.2d 863, 870 (4th Cir. 1988)). In order to determine whether a condition imposed upon a pretrial detainee constitutes punishment, the court must decide whether the condition "was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 538-40 (1979)). "The relevant precedent teaches that 'punishment, whether for a convicted inmate or a pretrial detainee, is the product of intentional action, or intentional inaction, respecting known and *substantial* risks of harm.'" *Riddick*, No. 3:15CV361, 2016 WL 3282213, at *4 (citing *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994)). Furthermore, the challenged condition only constitutes punishment where it causes injury. *Id.* "There is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." *Id.* (quoting *Bell*, 441 U.S. at 539 n.21). The due process rights of a pretrial detainee are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). Practically, however, courts do not distinguish between the Eighth and Fourteenth Amendments when evaluating a pretrial detainee's § 1983 claim; the "deliberate indifference" standard applicable to claims under the Eighth Amendment applies to both. *See Ervin v. Mangum*, 127 F.3d 1099 (4th Cir. 1997) (collecting cases).

To show a violation of constitutional rights, a plaintiff must show both (1) the deprivation of a basic human need that was "sufficiently serious," when measured by an objective standard, and (2) that the responsible prison officials had a "sufficiently culpable state of mind." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citing *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). To satisfy the objective component, the plaintiff must show that the challenged condition caused or constituted an extreme

deprivation. *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). "[T]o demonstrate such an extreme deprivation, [the plaintiff] must allege a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from [his] exposure to the challenged conditions." *Odom v. South Carolina Dept. of Corrections*, 349 F.3d 765, 770 (4th Cir. 2003) (quoting *De'Lonta*, 330 F.3d at 634). "Compelling a showing of significant physical or emotional harm, or a grave risk of such harm, infuses an element of objectivity into the analysis, lest resolution of the seriousness of the deprivation devolve into an application of the subjective views of the judges deciding the question." *Shakka v. Smith,* 71 F.3d 162, 166 (4th Cir. 1995) (citing *Strickler,* 989 F.2d at 1370–80).

To fulfill the subjective component, the plaintiff must demonstrate that each individual named in the complaint acted with "deliberate indifference" to the plaintiff's health or safety. *Farmer*, 511 U.S. at 834. The Supreme Court explained:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837. Deliberate indifference is more than mere negligence but less than malice. *Flores v. Stevenson,* Civil Action No. 2:11–cv–01278–TMC–BHH, 2012 WL 2803721 (D.S.C. May 11, 2012). Put simply, the individuals named in the complaint would have a sufficiently culpable state of mind if they were each aware of an excessive risk of harm to the plaintiff's health or safety but disregarded it. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Brown v. North Carolina Dept. of Corrections*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)) ("[T]he test is whether the

guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so.")

### 1. Suable "persons" under § 1983

The DCR Defendants claim that they are not subject to liability under § 1983 because they are state agents and not suable persons under the statute. (ECF No. 95 at 3–4). In *Will v. Mich. Dept. of State Police,* the Supreme Court of the United States considered "the question whether a State, or an official of the State while acting in his or her official capacity, is a 'person' within the meaning of Rev. Stat. § 1979, 42 U.S.C. § 1983." *Id.*, 491 U.S. 58, 60 (1989). Examining the language and purpose of the statute, the Supreme Court concluded that Congress never intended to subject States to liability for deprivations of civil liberties when such suits would have otherwise been barred by the States' sovereign immunity. *Id.* at 66. The Court further held that a State's officials "acting in their official capacities" were not "persons" under § 1983, explaining: "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official; rather, it is a suit against the official's office. As such, it is no different from a suit against the State itself." *Id.* at 71 (citations omitted).

The Court later clarified its holding in *Will,* making a distinction between officials acting in their official capacities and officials acting in their personal capacities under color of state law. *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985); *see also Hafer v. Melo,* 502 U.S. 21 (1991). The Court indicated that because the real party in interest in an "official-capacity" suit is the governmental entity, rather than the named official, the target of such a claim is the entity's "policy or custom." *Hafer,* 502 U.S. at 25 (citing *Graham,* 473 U.S. at 166). "Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law."

*Id.*

The significance of this distinction is key to the viability of a § 1983 complaint against a state official. As a general proposition, the doctrine of sovereign immunity bars suit against a State. *Will,* 491 U.S. at 67. By extension, sovereign immunity precludes claims for money damages against state officials acting in their official capacities, including claims brought pursuant to § 1983. *Id.* at 71. In contrast, a suit for money damages brought against a state official, who acted in his personal capacity under color of state law, is not barred by the doctrine of sovereign immunity. *Hafer,* 502 U.S. 30. Instead, a state official sued in his personal capacity under § 1983 must rely upon "personal immunities," such as qualified immunity, to bar suit. *Id.* at 31.

The determination of whether a defendant has been named in his official or personal capacity is generally made by examining "the face of the complaint." *Amos v. Maryland Dep't of Pub. Safety & Corr. Servs.,* 126 F.3d 589, 609 (4th Cir. 1997), *vacated on other grounds by* 524 U.S. 935 (1998). "[A] plaintiff need not plead expressly the capacity in which he is suing a defendant in order to state a cause of action under § 1983." *Biggs v. Meadows,* 66 F.3d 56, 60 (4th Cir. 1995). However, "[w]hen a plaintiff does not allege capacity explicitly, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." *Id.* at 61. In *Foreman v. Griffith,* the Fourth Circuit discussed the significance of the factors outlined in *Biggs*:

> With respect to assessing the nature of a plaintiff's claim or claims, the *Biggs* court stated that the plaintiff's failure to allege that the defendant acted in accordance with a governmental policy or custom or the lack of indicia of such a policy or custom on the face of the complaint indicates that a state actor has been sued in his individual capacity. With respect to the nature of the relief sought, the *Biggs* court also stated that the plaintiff's request for compensatory or punitive damages indicates an individual

capacity suit since such relief is unavailable in official capacity suits. Finally, with respect to the course of proceedings, the *Biggs* court stated that the defendant's assertion of qualified immunity as a defense indicates an individual capacity suit, since such a defense is only available in individual capacity suits.

81 Fed. Appx. 432, 435 (4th Cir. 2003). Ultimately, "the underlying inquiry remains whether the [p]laintiff's intention to hold a defendant personally liable can be ascertained fairly." *Biggs*, 66 F.3d at 61.

In this matter, Holbrook explicitly accuses the DCR Defendants of violating his rights while "acting under official capacity." (ECF No. 100 at 2). However, it is not clear that Holbrook, as a *pro se* litigant, has an appreciation for the legal distinction between official and personal capacity as it relates to the validity of a § 1983 claim. Considering the *Biggs* factors, Holbrook has not alleged that the DCR Defendants acted in accord with an official custom or policy and instead complains of mistreatment at their hands both during his arrest and when he was housed at the Western Regional Jail. While he does not specify the relief he seeks, he references suffering "damages" at times, indicating he is suing the DCR Defendants in their individual capacities because damages are unavailable against state agents sued in their official capacities. (ECF No. 100 at 1–2). While his allegations are at times confusing, the undersigned **FINDS** that Holbrook's claims are an attempt to sue the DCR Defendants in their individual—rather than official—capacities, and the DCR Defendants are not entitled to summary judgment on this basis.

### 2. *Holbrook's renunciation of his allegations*

The DCR Defendants assert that Holbrook provides no evidence of constitutional violations and admitted during his deposition that his allegations that Defendants Endicott, Preece, and Wallace attacked him and that Defendants Endicott and Preece

attacked his mother on January 6, 2021, were false. (ECF No. 95 at 5). The DCR Defendants note a portion of Holbrook's deposition testimony where he admitted under oath that Defendants Endicott, Preece, and Wallace did not attack him or his mother during his arrest, stating that he realized his mistake after watching video of the events. (ECF No. 94-1 at 17). Similarly, Holbrook abandoned his claim that Defendant Albright applied a taser to Holbrook's rectum; rather, admitting that none of the DCR Defendants tased him. (ECF No. 94-1 at 6). In his response opposing the DCR Defendants' motion, Holbrook does not dispute that he made the statements recorded in the deposition transcript or reassert his allegations about those DCR Defendants' involvement in his arrest, arguing instead that they used force to make him enter a plea agreement under duress. (ECF No. 100 at 2).

As the record reflects that Holbrook has withdrawn his claims that certain DCR Defendants participated in his arrest and violated his rights, the undersigned **FINDS** that there is no factual dispute and the DCR Defendants are entitled to summary judgment as to Holbrook's claims that Defendants Endicott, Preece, Wallace, and Albright violated his rights during his arrest on January 6, 2021.

### 3. *No evidence of wrongdoing at Western Regional Jail*

The DCR Defendants argue that Holbrook provides no evidence that they tampered with his food or mail at the WRJ, or that he was injured by Defendant Albright's alleged institution of a bounty on him, or from Holbrook's alleged observation of a sex act while incarcerated, and that some of his claims are moot. (ECF No. 95 at 5–6). In his response opposing the DCR Defendants' motion, Holbrook reiterates his contention that he was served food tainted with deleterious substances, including pubic hair and perhaps urine, after he complained that his prison cell's only window had a

"view of 2 cousins having sex." (ECF No. 100 at 3–4).

### a. View of a sex act

As to Holbrook's claim that he was subjected to "psychological torture" because he was placed in a "segregation cell with the only window having a view of 2 cousins having sex," (*Id.* at 3), he provides no evidence supporting his view of events. Furthermore, even accepting Holbrook's unsupported allegation, being placed in a room with a view of two adult people having sex, regardless of their familial relation, does not amount to a constitutional deprivation. Particularly, when no one forced Holbrook to watch. Holbrook does not claim that he was in any way compelled to look out the window, keep his eyes open, and observe the scene. Being scandalized, repulsed, or disturbed by the behavior of others may have been an unpleasant experience for Holbrook, but his constitutional rights were not implicated in these circumstances. The undersigned **FINDS** that the DCR Defendants are entitled to summary judgment on this claim.

### b. Tampering with food

Holbrook has provided no further support for his bare allegation that an unidentified person at the WRJ tampered with his food, thus inhibiting his practice of his religion. However, assuming Holbrook's allegations are true, a single incident of a meal possibly containing a malodorous substance and approximately four hairs of unknown origin does not rise to the level of a constitutional violation. *Baccus v. Stirling*, No. 8:18-CV-1880-JFA-JDA, 2018 WL 8332581 (D.S.C. Oct. 15, 2018), *report and recommendation adopted*, No. 8:18-CV-1880-JFA-JDA, 2019 WL 978866 (D.S.C. Feb. 28, 2019), *aff'd*, 776 Fed. Appx. 142 (4th Cir. 2019) (holding that inmate failed to state a claim for relief when he alleged constitutional violations based on suspected pubic hairs in his dinner tray). Although he does not direct the Court to any evidence showing that

the DCR Defendants tainted his food tray, he makes the unsupported and illogical leap that this must the case. Furthermore, he postulates, again without any evidence, that the food tampering was in retaliation for his report of sexual misconduct by the cousins, because he recalls that the two events happened around the same time. Speculation is not sufficient to support a claim. Given the absence of evidentiary support, the undersigned **FINDS** that the DCR Defendants are entitled to summary judgment as to Holbrook's claim that they tainted his food in retaliation for his reporting of sexual activity between other people.

Holbrook also alleges that his food may have been contaminated with "potentially deadly viruses" because he contracted COVID-19 after complaining to staff and his family members about activities at the WRJ. (ECF No. 100 at 3–4). Holbrook provides absolutely no indication of who may have tainted his meal with a virus and no proof that the meal was actually infected. Furthermore, according to the Centers for Disease Control and Prevention, "[c]urrently there is no evidence to support transmission of COVID-19 associated with food." CDC.gov, *Food Safety and Coronavirus Disease 2019 (COVID-19)*, which can be reviewed at https://www.cdc.gov/foodsafety/newsletter/food-safety-and-Coronavirus.html.

Holbrook's suspicion that the DCR Defendants deliberately tainted the food he was served at the WRJ with a virus based solely on the fact that he contracted COVID-19 is a facile deduction and lacks any support in the record. The undersigned **FINDS** that Holbrook's assertion that some unknown individual contaminated his food with coronavirus, without any concrete evidence to support it, cannot survive a motion for summary judgment.

25

### c. Tampering with mail

In regard to Holbrook's claim that the DCR Defendants tampered with his mail, the DCR Defendants note that, while Holbrook claims several of his letters were lost, he has not provided any evidence to show that **they** were responsible for the loss. (ECF No. 95 at 5). In his response opposing the DCR Defendants' motion, Holbrook does not address the issue and points to no concrete evidence to show that any of the DCR Defendants ever possessed, interfered with, or tampered with his mail. *Baccus,* 2018 WL 8332581, at *3 (holding that prisoner's claim that his mail was tampered with because he sent mail that was apparently not received did not state a violation of prisoner's constitutional rights). Accordingly, the undersigned **FINDS** that there exists no genuine dispute of a material fact and the DCR Defendants are entitled to summary judgment on this issue.

### 4. No evidence that DCR Defendants influenced plea

The DCR Defendants maintain that Holbrook has failed to provide even a scintilla of evidence showing that they coerced him into accepting a plea deal. (ECF No. 95 at 6). In his response, Holbrook repeats his accusation that the DCR Defendants violated his rights by using force and coercion "to extort him into pleas under [duress] leaving him with scrapes, bruises, and mental health issues." (ECF No. 100 at 2). Holbrook claims that because the DCR Defendants tampered with his food, he was left "[malnourished] and in duress." (*Id.* at 3). He claims that the DCR Defendants' pressure on him to plead guilty and "extort him into pleas" left him with physical and mental health issues, citing to his grievances and an inmate statement. (*Id.* at 2). In one unsuccessful grievance, filed and resolved in June 2021, Holbrook alleges that he was coerced into pleading guilty under duress at his parole hearing, alleging that Defendant Diamond assaulted him "just

hours before while in restraints." (ECF No. 100 at 18). In a document appearing to be a witness statement from an inmate housed near Holbrook at the WRJ, the inmate recounts specific incidents he witnessed when a guard said rude or cruel things to Holbrook, placed a bounty on him, and refused him showers because Holbrook was planning to "expose the corruption" at the jail. (*Id.* at 25–26).

Based on the record before this Court, no reasonable jury could find in favor of Holbrook on this claim. To begin, there is no obvious reason for the DCR Defendants to be involved in Holbrook's plea decision, and he never provides an explanation as to why the DCR Defendants would care about his plea. The charges were pending against Holbrook in Wayne County, not in Cabell County where the jail is located, and Holbrook fails to provide any proof that the DCR Defendants had contacts with the Wayne County Court, prosecutor, or defense attorney, or that they received any information pertaining to Holbrook's plea agreement. Moreover, the materials upon which Holbrook relies do not show that he was coerced into pleading guilty. A grievance stating the same claims Holbrook makes now, with no additional facts or evidence—which was filed months after he pled guilty and initiated this action—is not evidence that the DCR Defendants exerted undue pressure on him to plead guilty. In his brief, Holbrook claims that the DCR Defendants inflicted scrapes, bruises, and psychological injury on him, but he concedes in his deposition that he has not received any mental health treatment. Furthermore, he does not provide medical records or photographs to support his claim. Holbrook did file some pictures, supposedly showing scrapes and bruises on his body, but these were taken on the day of his arrest, likely before he was formally charged, and certainly before a plea agreement was offered. (*Id.* at 23). The pictures, which were taken by Huntington police officers, have no accompanying context that could possibly indicate that the DCR

27

Defendants harmed Holbrook in order to force him to plead guilty to a misdemeanor charge. Likewise, the statement of Holbrook's fellow inmate sheds no light on the voluntariness of Holbrook's plea.

No other part of the record could be considered evidence that Holbrook was coerced into making a guilty plea. While Holbrook contends that the DCR Defendants' tampering with his food left him malnourished, in his pleadings he describes only isolated incidents when he suspected his food had been contaminated. Missing a meal or two is not such a serious deprivation that any reasonable factfinder could conclude made Holbrook plead guilty involuntarily. He does not contend, and the record does not show, that his conviction was ever invalidated on the basis that his guilty plea was not voluntary. In fact, Holbrook attaches a July 2021 order from the Circuit Court of Wayne County, prepared after a hearing to gather evidence and testimony, finding that Holbrook failed to show that his guilty plea was the result of coercion, or that his plea was invalid. (ECF No. 100 at 33–34).

Holbrook thus fails to show that there is a genuine dispute of material fact as to whether the DCR Defendants violated his rights by coercing him to plead guilty. As such, the undersigned **FINDS** that the DCR Defendants are entitled to summary judgment on this ground.

### 5. *No supervisory liability*

With respect to Holbrook's claims against Defendant Aldridge, the DCR Defendants contend that Holbrook makes no allegations of direct violations by Defendant Aldridge, and Defendant Aldridge is not subject to liability based on his supervisory role. (ECF No. 95 at 6–7).

"It is well established that the doctrine of respondeat superior does not apply in §

1983 claims." *Hurt v. Corr. Ofc. Rounds*, No. CV DKC-15-596, 2016 WL 1059359, at *8 (D. Md. Mar. 17, 2016) (citing *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004)). In a § 1983 action, "[l]iability of supervisory officials is not based on ordinary principles of respondeat superior, but rather is premised on a recognition that supervisory indifference or tacit authorization of subordinates misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Id.* (quoting *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001)). In order to state a claim for supervisory liability, the § 1983 plaintiff must demonstrate that "(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Id.* (citing *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

In this case, Holbrook "has pointed to no action or inaction on the part of [the DCR Defendants] that resulted in a constitutional injury." *Id.*; *see also Battle v. N. Carolina Dep't of Pub. Safety*, No. 1:17-CV-174-FDW, 2018 WL 4620619, at *9 (W.D.N.C. Sept. 26, 2018) ("Plaintiff has stated a facially sufficient claim against the foregoing supervisory Defendants by alleging that they were either personally involved in the violations or knew of their officers' and staff's actions and failed to stop them."). He thus cannot show any constitutional violation by Defendant Aldridge as a result of his supervisory role. The undersigned **FINDS** that the DCR Defendants are entitled to summary judgment as to any claims based on Defendant Aldridge's supervisory liability.

### 6. *Mootness*

The DCR Defendants argue that Holbrook's allegations that he was prevented from practicing his religion or accessing the library are moot because he has since been moved to a different facility precluding injunctive relief. In addition, Holbrook admitted in his deposition that he did not suffer any injury or damages as a result of any supposed deprivation. (ECF No. 95 at 5–6). Holbrook did not address this claim specifically in his response in opposition to the defendants' motions. Indeed, the unrebutted testimony Holbrook gave at his deposition confirms that he did not suffer any compensable injury from being prevented access to the law library. (ECF No. 94-1 at 17). As to his claim that he was not able to practice his religion, Holbrook similarly does not argue that he suffered a compensable injury as a result.

The DCR Defendants are correct that "as a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there." *Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009). "The reasons for finding mootness in such a context are clear. Once an inmate is removed from the environment in which he is subjected to the challenged policy or practice, absent a claim for damages, he no longer has a legally cognizable interest in a judicial decision on the merits of his claim." *Incumaa v. Ozmint*, 507 F.3d 281, 287 (4th Cir.2007).

A narrow exception to the mootness doctrine exists for claims that are "capable of repetition, yet evading review." *Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 462 (2007). However, "[j]urisdiction on the basis that a dispute is capable of repetition, yet evading review is limited to the exceptional situation in which (1) the challenged action is in its duration too short to be fully litigated prior to cessation

or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Incumaa*, 507 F.3d 281, at 289 (internal quotation marks and citations omitted). Plaintiff has provided no indication, neither in a response to Defendants' motions, nor in his appearance before the Court during the status conference, that the complained of conduct is continuing following his transfer from the WRJ.

When considering a similar case, where an inmate alleged his constitutional rights had been infringed by the practices of a prison, this Court held that, due to the plaintiff's transfer, there was "no reasonable expectation that [the plaintiff] will be subjected to [the] same alleged misconduct at" the prison where the alleged wrongs occurred. *Owens v. FCI Beckley*, No. 5:12-CV-03620, 2013 WL 4519803, at *8 (S.D.W. Va. Aug. 27, 2013); *see also Pumphrey v. United States*, No. CV 5:15-06509, 2015 WL 7774297, at *2 (S.D.W. Va. Nov. 5, 2015), *report and recommendation adopted*, No. 5:15-CV-06509, 2015 WL 7779508 (S.D.W. Va. Dec. 2, 2015) (inmate's requests for injunctive relief regarding violations of the Eighth Amendment were rendered moot by the inmate's transfer to a different facility); *Redden v. Ballard*, No. 2:17-CV-01549, 2018 WL 4327288, at *9 (S.D.W. Va. July 17, 2018), *report and recommendation adopted*, No. 2:17-CV-01549, 2018 WL 4323921 (S.D.W. Va. Sept. 10, 2018), *aff'd*, 748 Fed. Appx. 545 (4th Cir. 2019) ("Based upon the plaintiff's transfer, all forms of declaratory and injunctive relief sought in this court are now moot.").

Holbrook has provided no indication that he will ever again be subject to a deprivation of his right to practice his religion or access the law library at the WRJ. Accordingly, the undersigned **FINDS** that any claim Holbrook made for injunctive relief concerning the conditions he experienced at the WRJ are rendered moot by his transfer

to a different facility. Insofar as he seeks monetary damages, his claims are not moot, but as stated above, Holbrook has failed to establish a compensable claim. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir.1991) (finding that inmate's transfer or release from confinement does not moot the inmate's claim for monetary damages).

### 7. *Failure to exhaust administrative remedies*

Finally, the DCR Defendants assert that Holbrook's claims must be dismissed because he has not exhausted his administrative remedies. (ECF No. 95 at 7–10). Holbrook claims that he wrote grievances but received no answer or reply. (ECF No. 100 at 4). He attaches several documents to his response in opposition to the DCR Defendants' motion, which are grievances he alleges went unanswered by the jail's administration. (ECF No. 100 at 9–22). Notably, all but one of the grievances were prepared **after** Holbrook filed the instant action, and the one completed prior to institution of this case was submitted to the WRJ only three days before Holbrook drafted the complaint herein. (*Id.* at 21). That grievance was not exhausted until March 25, 2021, ten days after the Clerk filed Holbrook's complaint. (*Id.*).

The Prison Litigation Reform Act ("PLRA") requires inmates to exhaust administrative remedies prior to filing a complaint in federal court. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see also Porter v. Nussle*, 534 U.S. 516, 524 (2002) ("Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory. All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy, and effective. Even when the prisoner seeks relief not available

in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit.") (citations and internal quotation marks omitted)). However, administrative exhaustion is "not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner." *Hart v. Roderick*, No. CV GLR-15-2054, 2016 WL 3940219, at *3 (D. Md. July 21, 2016) (citations omitted). Instead, exhaustion is an affirmative defense, and the defendant bears the burden of proving that a prisoner failed to exhaust administrative remedies. *Id.*

The Supreme Court recently reiterated the mandatory exhaustion requirement found in § 1997e, but pointed out that the statute contains one explicit exception; the inmate need not exhaust "unavailable" remedies. *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). The Court provided examples of unavailable remedies, noting "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide relief to aggrieved inmates." *Id.* Second, an administrative process is likewise unavailable when it is "so opaque" that "no ordinary prisoner can discern or navigate it." *Id.* Finally, an inmate need not exhaust administrative remedies when prison officials thwart the inmate's access to the grievance procedure "through machination, misrepresentation, or intimidation." *Id.* at 1860. "[S]uch interference with an inmate's pursuit of relief renders the administrative process unavailable." *Id.* The prisoner bears the burden of establishing that an administrative remedy was unavailable. *Graham v. Gentry,* 413 Fed. Appx. 660, 663 (4th Cir. 2011). "Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the inmate to show, by a preponderance of the evidence, that

exhaustion occurred or that administrative remedies were unavailable." *Knutson v. Hamilton*, No. 7:20-CV-00455, 2021 WL 4163981, at *3 (W.D. Va. Sept. 13, 2021) (citations omitted).

Exhaustion under the PLRA "is a question of law to be determined by the judge." *Creel v. Hudson*, No. 2:14-cv-10648, 2017 WL 4004579, at * 3 (S.D.W. Va. 2017) (quoting *Drippe v. Tobelinski*, 604 F.3d 778, 782 (3rd Cir. 2010)). "Judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." *Woodhouse v. Duncan*, 741 Fed. Appx. 177, 178 (4th Cir. 2018) (citation omitted); *also Bryant v. Rich,* 530 F.3d 1368, 1373-74, 1376 (11th Cir. 2008) (holding that factual disputes concerning exhaustion may be decided by the court sitting as fact-finder, "so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record."). "[T]he district court may dismiss for failure to exhaust as long as the prisoner has been provided an opportunity to address the issue." *Bustillo v. Beeler,* 495 Fed. Appx. 343, 344 (4th Cir. 2012) (citing *Moore,* 517 F.3d at 725).

Holbrook admits through the documents he produced that he did not exhaust his administrative remedies prior to filing suit. While he does not expressly allege that the administrative remedies were unavailable, he asserts that Captain Diamond used "force to threaten, [coerce], manipulate and intimidate [Holbrook] after filing grievances." (ECF No. 100 at 3). He further alleges that the defendants subjected him to psychological torture and bounties were placed on his life because he filed grievances. (*Id*. at 3–4).

In response to a motion for summary judgment for failure to exhaust administrative remedies, a bare assertion that is 'unsupported by any detail' will not satisfy a prisoner plaintiff's 'burden of showing that remedies were unavailable.'" *Mendez v. Breckon*, No. 7:20-CV-00046, 2021 WL 4268890, at *3 (W.D. Va. Sept. 20, 2021)

34

(quoting *Rodrigues v. Hamilton*, 7:20-cv-338, 2021 WL 413530, *6 (W.D. Va. Feb. 5, 2021)); *also Creel v. Hudson*, No. 2:14-CV-10648, 2017 WL 4004579, at *4–6 (S.D.W. Va. Sept. 12, 2017) ("Unsubstantiated and conclusory assertions by an inmate that prison officials thwarted pursuit of the administrative process are insufficient to excuse failure to exhaust.") (citations omitted); *Tosado v. Gilbert*, No. 7:20-CV-00287, 2020 WL 6487685, at *3–4 (W.D. Va. Nov. 4, 2020) (holding that "numerous courts within the Fourth Circuit and elsewhere have held that 'unsubstantiated and conclusory assertions by prisoner-plaintiffs that prison grievances were hindered, without providing any details regarding the date the alleged grievances were submitted or to whom they were submitted, fail to create a genuine issue of material fact sufficient to withstand summary judgment.'") (citations omitted). The grievances offered by Holbrook, however, do not show that administrative remedies were unavailable; if anything, they show that Holbrook continued to utilize the prison grievance procedure long after the events he describes in his pleadings and after filing this suit.

As with his other claims, Holbrook fails to present any concrete evidence to show that there exists a dispute of material fact such that a rational factfinder could find in his favor. Therefore, in addition to the substantive reasons outlined above, the undersigned **FINDS** that the DCR Defendants are entitled to summary judgment as to Holbrook's claims because he did not exhaust his administrative remedies before filing suit, and he has failed to show that the remedies were unavailable.

### C.    *HPD Defendants' Motion for Summary Judgment*

#### 1.    *Failure to establish excessive force in arrest*

Holbrook challenges the HPD Defendants' use of force during his arrest on January 6, 2021. Use of force in arrest claims are governed by the Fourth Amendment,

which prohibits unreasonable seizures, and the Fourteenth Amendment, which prohibits the use of force that amounts to punishment before an arrestee's conviction for a crime. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). To determine whether an officer's use of force violates an arrestee's constitutional rights, courts consider whether the officer's actions were objectively reasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 396. In assessing reasonableness, "a court must focus on the moment that the force is employed." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application ... its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citations and markings omitted). After viewing the evidence in the light most favorable to Holbrook, at the summary judgment stage "the question of whether the officer's actions were reasonable is a question of pure law." *Id.*

According to Holbrook's deposition testimony, he called emergency services after he heard someone rattling the door to his home and smelled smoke under the floorboards. (ECF No. 97-1 at 8). When officers responded to the scene, Holbrook suspected that they were not "real cops" because he did not expect police to come when he called to report a fire. (*Id.* at 8–9). After learning the badge number of one officer, he attempted to confirm the officer's identity by calling emergency services but "couldn't get an answer," at which point he told the responding officers he would come to the back door. (*Id.* at 9). However, before he could leave the residence, officers broke through the

door, brought him to the ground, and used a taser on his buttocks and anus despite his lack of resistance. (*Id.*).

The HPD Defendants' representation of events is similar to Holbrook's narrative to the extent they agree that Holbrook reported smoke to 911 and they smelled smoke at the residence. They add that Defendant Heighton knew from a previous encounter at Holbrook's address that children lived there, children's toys were seen in the yard, Holbrook's behavior was erratic, and Defendant Heighton tased Holbrook twice in his lower back when he tried to grab Heighton's taser and  resisted arrest. (ECF No. 98 at 4–6).

### a.  *Defendant Miller*

The HPD Defendants contend—and the record shows—that Holbrook admitted in his deposition that Defendant Miller did not use force during his arrest on January 6, 2021. (ECF Nos. 98 at 9–10; 97-1 at 11). Holbrook does not contradict this representation in his response in opposition to the HPD Defendants' motion. He provides simply that Defendant Miller "did not uphold the law, by allowing officers to misuse their authority." (ECF No. 100 at 4). Accordingly, the undersigned **FINDS** that Holbrook's sworn testimony that Defendant Miller did not use force to effectuate his arrest shows that there is no material factual dispute and the HPD Defendants are entitled to summary judgment as to Defendant Miller's use of force in the arrest. Holbrook's claim of bystander liability is addressed below.

### b.  *Defendant Heighton*

The HPD Defendants contend that Defendant Heighton did not use excessive force to arrest Holbrook given the circumstances of his arrest. (ECF No. 98 at 12–18). Holbrook insists that Defendant Heighton's use of force was unreasonable considering

that Holbrook himself sought emergency services, he told officers that he would come to the alley door, no smoke or fire was visible on body camera footage, Holbrook did not initiate the scuffle, and Defendant Heighton tased him in the "rectal region." (ECF No. 100 at 4–7).

To repeat, in order to overcome a motion for summary judgment, Holbrook must provide the Court with some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). Holbrook's argument that the use of force was unreasonable given that Holbrook himself called emergency services is unavailing. Use of force is not automatically unreasonable when it is used against the individual who initiated the encounter; calling 911 does not create a shield around an individual whose behavior otherwise justifies forceful intervention. There is no dispute between the parties about this fact, and it does not support Holbrook's position. The same is true of Holbrook's claim that he did not initiate an attack on Defendant Heighton and therefore Defendant Heighton's use of force was unreasonable. The reasonableness of the use of force is not contingent on who "started it," especially when, as here, Holbrook admits he called emergency services about a fire in his residence and suspicious people lurking near the home and that he refused to exit the residence upon command. In the situation presented to Defendant Heighton, when an uncooperative and paranoid individual refused to exit a possibly burning building, limited use of force to subdue him to compliance was reasonable.

As to Holbrook's contention that there is no smoke or fire visible on the body cam footage he viewed, such lack of visible smoke is a mere scintilla of evidence weighing in Holbrook's favor when the record, including Holbrook's own pleadings, deposition testimony, the testimony of his mother and sister, and police reports overwhelming

confirm that the air in and around Holbrook's residence smelled of smoke. To state the obvious, body camera footage does not capture smells. Holbrook's self-serving argument in response to the HPD Defendants' motion, that the lack of visible smoke or fire on body cam footage renders Defendant Heighton's use of force unreasonable, is unpersuasive and does not constitute evidence sufficient to show a genuine dispute of material fact.

Holbrook insists that Defendant Heighton's use of force was unreasonable because Holbrook informed officers he would exit through the alley door. This explanation only makes it clear that Holbrook was not compliant with officers' directives at the time Defendant Heighton used force. In support of their motion, the HPD Defendants supplied a narrative report prepared by Officer Michael Cremeans, who was one of the responding officers present at Holbrook's home at the time of his arrest. (ECF No. 97-3 at 10-11). This narrative report is part of the official police record of the incident and its authenticity and accuracy have not been challenged by Holbrook. Officer Cremeans states that 911 received a call at 3:46 a.m. on January 6, 2021 from a resident of Holbrook's home stating that someone had broken into the residence and set it on fire. (*Id.*). The Huntington Police Department and the Huntington Fire Department responded to the residence. When Officer Cremeans approached the house, he could hear an active disturbance and someone calling for help. Officer Cremeans could not gain entry into the house, because the doors were locked. Although Officer Cremeans and the Huntington Fire Department personnel identified themselves, Holbrook responded that they were not real officers and he refused to come to the door. Officer Cremeans smelled smoke from inside the residence and determined that entry into the house was necessary. (*Id.*). The firefighters retreated from the scene due to Holbrook's erratic behavior, so one of the police officers used a Halligan obtained from the firefighters to force entry into the

house. Shortly thereafter, Holbrook became engaged in a struggle with Defendant Heighton, which prompted Holbrook's mother to interfere. Other officers had to remove her from the fray and ultimately Holbrook had to be tased to subdue him and remove him from a residence that was still potentially on fire. (*Id.*).

Fires are by nature a time-sensitive matter. While Holbrook may have had some reason to be suspicious of the responding officers and seek assurance of their authenticity before exiting the residence, Defendant Heighton was also reasonable to use force given the urgency of the situation. Officers had a conversation with Holbrook through the window and, despite the presence of smoke, waited at least some time while Holbrook questioned their identities before forcibly entering the house. Even assuming that Holbrook meant to immediately exit the residence and officers could have avoided using force, officers had no way of knowing if and when Holbrook would actually get around to coming outside of his own accord. Holbrook provides no explanation as to why Defendant Heighton should have taken him at his word when Holbrook repeatedly admits he did not believe or trust that the police officers were, in fact, police officers. The analysis of whether the use of force is reasonable is not retrospective. *Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). It was reasonable for Defendant Heighton to use force to enter the potentially burning residence after an unsuccessful attempt to coax Holbrook outside.

The parties agree that Defendant Heighton was among the officers who broke through Holbrook's door and used force to gain physical control over him, including through physical strikes and the use of a taser. Holbrook posits that this force was

unreasonable because he "was fully complying with officers after confirming their authenticity." (ECF No. 100 at 5–6). In his deposition testimony, Holbrook contends that, contrary to the HPD Defendants' description of events, he did not resist his arrest and was "literally laying on the ground getting beat." (ECF No. 97-1 at 9). In her deposition testimony, Holbrook's mother provides that she saw officers beating and tasing Holbrook as Holbrook continued to insist that the officers were not "real police." (ECF No. 104-4 at 4). His sister testified that prior to his being tased, Holbrook was "all rowdied up, not wanting the police to come in," and that he continued screaming and yelling after he was tased. (ECF No. 104-2 at 5). She further testified that officers asked her to assist in calming Holbrook after he was subdued on the floor of the residence and recounted that upon entering the house, she saw that Holbrook "going crazy," "making up all kinds of stuff," "yelling and screaming" and "getting mad because the police [were] there arresting him." (*Id.* at 4). The HPD Defendants assert that Defendant Heighton and other officers attempted to restrain Holbrook to remove him from the residence, which showed signs of fire, and claim that Holbrook resisted arrest and attempted to take Defendant Heighton's taser. (ECF No. 98 at 5–6). The official narratives of the incident prepared by responding officers, including Defendant Heighton, are all similar. (ECF No. 97-3 at 2–3, 10–12).

From Holbrook's own arguments and testimony, it is clear that he was not compliant with officers who responded to his call reporting a fire. Despite his assertion that there was no fire, Holbrook's call to 911 and the sworn testimony of eyewitnesses, including Holbrook himself, indicate that there was smoke coming from the residence and Holbrook refused to leave while repeatedly accusing the officers of not being legitimate police. Holbrook attempts to portray himself as "fully complying with officers

after confirming their authenticity," (ECF No. 100 at 5), yet he continuously refused to obey the officers' commands to leave the smoking residence as evidenced by the fact that he was still in the residence when officers broke through the door. The reasonableness of the use of force is analyzed from the officer's perspective, not Holbrook's. Holbrook gave officers no reason to believe that he would suddenly begin complying with their orders.

Furthermore, the sworn testimonies of Holbrook's mother and sister cast significant doubt on Holbrook's self-serving representation that he did not struggle with the officers when they attempted to subdue him. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Holbrook's contention that he was not resisting the officers provides a mere scintilla of evidence incapable of defeating the HPD Defendants' motion for summary judgment; the overwhelming weight of the record supports a finding that he was resistant to officers' attempts to subdue him. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Even fully accepting Holbrook's description of events, given the emergency nature of the situation, Defendant Heighton's use of a taser to gain control over Holbrook was reasonable, and Holbrook's allegations do not create a genuine dispute of material fact.

Finally, while the parties agree that Defendant Heighton used a taser on Holbrook, they provide different descriptions of where on Holbrook's body it was deployed—specifically, Holbrook alleges that Defendant Heighton tased him in the anus or rectum while the HPD Defendants contend that Holbrook was tased in his lower back. However, in this case the precise location of where the taser made contact with Holbrook is not a

material fact. All parties agree that Defendant Heighton tased Holbrook in the midst of a brief but chaotic struggle on the floor of Holbrook's residence. The fact that the stun mechanism may have struck a sensitive area in this context does not render the use of force unreasonable. *Davis v. Richland Cnty.*, No. 4:12-CV-3429-RMG, 2014 WL 3805802, at *3 (D.S.C. July 30, 2014) (affirming that officer did not use excessive force when she tased a plaintiff "who was resisting seizure and refusing to obey oral commends" in the buttocks).

The HPD Defendants have met their burden to establish that there is no genuine dispute as to the material facts concerning Defendant Heighton's use of force in effectuating Holbrook's arrest. Holbrook has provided no evidence that Defendant Heighton's actions were objectively unreasonable given the information they had at the time. By Holbrook's own account, he called to report suspicious people and a fire, then refused to open his door for officers based on an incorrect suspicion that they were not "real cops," and refused to exit his house. He does not dispute Defendant Heighton's concern that children lived at Holbrook's house or the HPD Defendants' description of the scene on arrival, which included children's toys in the yard. While Holbrook provides explanations for his erratic and paranoid behavior in his deposition testimony, such context was not available to responding officers at the time. Therefore, the undersigned **FINDS** that there is no dispute as to the material facts and that Defendant Heighton's use of force to subdue Holbrook—an admittedly uncooperative individual—was not unreasonable.

### 2. *Bystander liability*

As previously stated, Holbrook claims for the first time in his response that Officer Miller "did not uphold the law, by allowing officers to misuse their authority." (ECF No.

100 at 4). The undersigned **FINDS** that Holbrook challenges the constitutionality of Defendant Miller's actions on a theory that he failed to intervene in the unlawful actions of officers at the scene of Holbrook's arrest. The Fourth Circuit recognizes such a theory and has described it as "bystander liability for law officers." *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 203 (4th Cir. 2002); *see also Thomas v. Holly*, 533 Fed. Appx. 208, 221 (4th Cir. 2013) (recognizing theory of bystander liability for excessive force claims). This theory "recognizes that, in certain limited situations, bystanding officers are obliged to act." *Randall*, 302 F.3d at 204. The Fourth Circuit explained in *Randall* that "[t]he rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer." *Id.* at 204 n.24. "[A]n officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id.* at 204.

Simply put, Holbrook has not shown that any officer violated his constitutional rights; therefore, Defendant Miller is not subject to liability for knowingly choosing not to act to prevent harm against Holbrook. The undersigned **FINDS** that the HPD Defendants are entitled to summary judgment as to the claim of bystander liability against Defendant Miller.

### 3. *No evidence that the HPD Defendants influenced plea*

The HPD Defendants deny that they extorted Holbrook to accept a plea to the misdemeanor charges that arose from the events when he was arrested and that no evidence exists that shows they conspired with the prosecutor, defense, or court. (ECF No. 98 at 18). In his second amended complaint, Holbrook did not make any allegations

concerning the voluntariness of his plea except to say that he pled no contest to a battery charge "under duress." (ECF No. 10 at 1). In his response to the HPD Defendants' motion, Holbrook does not point to evidence that show the HPD Defendants influenced his decision to plead guilty. (ECF No. 100 at 7). Furthermore, the analysis above reveals that the record is devoid of any evidence that the defendants unduly influenced Holbrook's decision to plead guilty such that his plea could be considered involuntary. Thus, the undersigned **FINDS** that there is no dispute over any material fact and insofar as the second amended complaint could be read to assert a claim against the HPD Defendants for influencing Holbrook's plea and they are entitled to summary judgment.

Further, the undersigned **FINDS** that the defendants have met their burden, Holbrook has not provided evidence to indicate that there exists a genuine dispute of material fact, and they are entitled to summary judgment against all claims lodged against them by Holbrook.

## IV.  <u>**Proposal and Recommendation**</u>

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** the defendants' motions for summary judgment, (ECF Nos. 94, 97); **DENY** Holbrook's motion to voluntarily dismiss, (ECF No. 101); **DISMISS** Holbrook's amended complaints, (ECF Nos. 7, 10); and **REMOVE** this case from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, The parties shall have fourteen days (filing of objections) and three days (if received by mail)

from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Plaintiff and counsel of record.

**FILED:** August 1, 2022

Cheryl A. Eifert
United States Magistrate Judge